Filed 4/12/22  P. v. Hall CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B308502 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA104968) |
| v. | |
| ELIJAH KAREEM SHABAZZ HALL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Judith Levey Meyer, Judge.  Vacated in part, affirmed in part as modified, and remanded with directions.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Paul M. Roadarmel, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

———————————————————

Defendant Elijah Kareem Shabazz Hall was convicted of one count of first degree murder, two counts of attempted second degree robbery, and three counts of second degree robbery. The jury found true gang enhancement allegations relating to all six offenses, and it also found true certain firearm enhancement allegations pertaining to the first degree murder and second degree robbery counts. The trial court sentenced Hall to a total state prison term of 23 years plus 75 years to life, which includes the gang and firearm enhancements, several of which were stayed.

On appeal, Hall claims the trial court erred in resuming his trial after suspending it for six months due to the COVID-19 pandemic. He also challenges the sufficiency of the evidence supporting the gang enhancements, and claims the judgment must be modified to include an additional day of presentence custody credit. The Attorney General concedes Hall is entitled to one more day of presentence custody credit, but otherwise maintains the trial court did not commit reversible error.

We issued an opinion that rejected Hall's first two appellate claims, and would have modified the judgment to include an additional day of presentence custody credit and affirmed the judgment as modified. In particular, we concluded that Hall's first claim of error failed because it is supported by only his speculative assertion that the six-month continuance prevented the jury from remaining impartial and open-minded, and because Hall could have mitigated any such hypothetical prejudice by asking the trial court to repeat the preliminary instructions prior to and after the suspension of trial, requesting leave to

2

recapitulate evidence that had been presented before the continuance, and, upon the resumption of trial, requesting that the trial court question jurors regarding whether they had received any extrajudicial information concerning this case during the hiatus.

We further concluded that Hall's second appellate claim failed because the People offered evidence that (1) Hall made recorded statements in gang vernacular suggesting that Hall and an accomplice perpetrated the robberies and attempted robberies together to accomplish a mission for their gang; and (2) Hall used a shotgun to kill a member of a rival gang in territory claimed by the victim's gang and Hall's gang, and, shortly before the murder, Hall manifested his intent to use a shotgun in connection with gang business.

The Supreme Court granted Hall's petition for review of our decision and transferred the matter back to us "with directions to vacate [our] decision and reconsider the cause in light" of certain amendments to the gang enhancement statute that took effect after we issued our opinion.

Although the Supreme Court instructed us to reconsider the cause in light of the new amendments to the gang enhancement statute, we again address Hall's first two claims of error and the presentence custody credit issue in this opinion. We do so because our prior opinion that resolved these matters has been vacated, Hall explicitly reasserts these issues in his supplemental briefing, the claim of error concerning the six-month continuance and the presentence custody credit issue are not mooted by the amendments to the gang enhancement statute, and it is unclear whether Hall could be retried on the

gang enhancements and certain firearm enhancements if he were to prevail on his initial sufficiency-of-the-evidence challenge.

As was the case in our prior opinion, we reject Hall's first two claims of error and, because the parties agree that Hall is entitled to one additional day of presentence custody credit, we modify the judgment to include that credit. Furthermore, the parties do not dispute that Hall is entitled to the benefit of the new amendments to the gang enhancement statute, and that the People did not offer sufficient evidence to warrant the imposition of the gang enhancements under the newly-amended statute. Accordingly, we vacate the gang enhancement findings and the related firearm enhancement findings, modify the judgment to include an additional day of presentence custody credit, and affirm the remainder of the judgment as modified. On remand, the People may elect to retry Hall on the gang enhancement allegations and the firearm enhancement allegations relating thereto. If the People do not elect to retry Hall, then the trial court shall resentence him accordingly.

## PROCEDURAL BACKGROUND

On November 4, 2019, the People filed a first amended information charging Hall and Avonte Zarion Jones (Jones) with two counts of attempted second degree robbery, in violation of Penal Code[1] sections 211 and 664 (counts 1 and 2); one count of murder, in violation of section 187, subdivision (a) (count 3); and three counts of second degree robbery, in violation of section 211 (counts 4, 5, and 6). The People also alleged certain gang and firearm enhancements. In particular, the People averred Hall

---

[1] Undesignated statutory citations are to the Penal Code.

4

and Jones committed all six offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members for the purposes of section 186.22, subdivision (b)(1)(C). With respect to count 3, the People averred Hall personally and intentionally discharged a firearm, a shotgun, which caused great bodily injury and death to the victim within the meaning of section 12022.53, subdivision (d). In connection with counts 1, 2, 4, 5, and 6, the People asserted that a principal personally used a firearm, a shotgun, within the meaning of section 12022.53, subdivisions (b) and (e)(1).

On March 11, 2020, the trial court impaneled the jury. On March 12, 2020, the court provided its preliminary instructions to the jury, the People and Jones delivered their respective opening statements, Hall reserved his right to make an opening statement at a later time, and five witnesses testified for the People. On Friday, March 13, 2020, five more witnesses testified for the People. On Monday, March 16, 2020, the trial court suspended the jury trial on account of the COVID-19 pandemic.[2]

The court ultimately continued the trial to September 14, 2020 due to the pandemic. Several days before the trial resumed, Hall filed a motion to "(1) declare a mistrial; (2) grant a continuance in this matter to some time in early 2021; [or] (3) sever the trial of [Hall] from that of [codefendant Jones], and then continue the trial of [Hall] and allow the [trial of Jones]

---

[2] We, sua sponte, take judicial notice of the fact that March 13, 2020 and March 16, 2020 were Friday and Monday, respectively. (See Evid. Code, §§ 452, subd. (h) & 459.)

5

to proceed."[3]  In his motion, Hall argued the court's health and safety rules (e.g., the requirement that witnesses wear masks) interfered with his right to a fair trial, and, given the prevalence of COVID-19, the courthouse was not a safe environment for the trial.  The trial court denied Hall's motion on September 14, 2020.[4]

On September 15, 2020, the trial court allowed both parties to provide "brief reopening" statements prior to the resumption of the People's case in chief.  On September 21, 2020, both sides rested, the parties made their closing arguments, the trial court issued its final instructions, and the matter was submitted to the jury.  On September 22, 2020, the jury found Hall guilty on all six counts.  In connection with count 3, the jury found that Hall committed first degree murder.  The jury also found true all the enhancements alleged in the first amended information, except for the firearm enhancements pertaining to the two attempted second degree robbery counts (i.e., counts 1 and 2).

On October 20, 2020, the trial court sentenced Hall to a determinate prison term of 23 years on counts 1, 2, 4, 5, and 6, followed by an indeterminate term with no parole eligibility for

---

[3]  On September 14, 2020, Jones pleaded no contest to manslaughter, robbery, and a gang enhancement.  Jones is not a party to this appeal.

[4]  On September 15, 2020, Hall's counsel orally moved for a mistrial because the witnesses were wearing face masks while testifying.  The trial court denied this motion as well.  On appeal, Hall does not challenge the trial court's ruling on this second mistrial motion.

75 years on count 3.[5]  With regard to the gang and firearm enhancements, the trial court:  imposed a gang enhancement of 1 year 8 months on count 1; stayed the gang enhancement on count 2; imposed a firearm enhancement of 25 years to life on count 3 and stayed the gang enhancement on that count; imposed a firearm enhancement of 10 years on count 4 and stayed the gang enhancement on that count; and imposed firearm enhancements of 10 years each on counts 5 and 6, respectively, and stayed the gang enhancements for those two counts.  The trial court awarded Hall 1,500 presentence custody credits toward his determinate sentence.  Hall timely appealed the judgment.

On November 29, 2021, we issued a decision that would have modified the judgment to reflect that Hall is entitled to 1,501 days of presentence custody credit, and affirmed the judgment as modified.

On February 9, 2022, the Supreme Court granted Hall's petition for review and transferred the case to us "with instructions to vacate [our] decision and reconsider the cause in light of Assembly Bill No. 333 (Stats. 2021, ch. 699)" (AB 333).  We vacated our decision later that day.  The parties thereafter filed supplemental briefing in which they agree that AB 333 applies to this case.

---

[5]  Hall's three-year prison sentence for count 1 is consecutive to his 20-year prison sentence for count 4, whereas his prison terms for counts 2, 5, and 6 run concurrent to the sentence imposed on count 4.

7

# FACTUAL BACKGROUND

This part summarizes (a) relevant aspects of the evidence offered by the People, and (b) Hall's defense. We summarize only those facts that are pertinent to this appeal.

## 1. The People's Evidence

### A. The Attempted Second Degree Robberies of D.C. and J.H. (Counts 1 and 2)

At around 3:00 a.m. on September 11, 2016, D.C. and J.H. stood near D.C.'s Buick in front of D.C.'s residence on West 9th Street in Long Beach. A Mercedes-Benz approached the men with its headlights dimmed; two African-Americans were inside this vehicle. One man jumped out of the backseat of the vehicle, pointed a single-barrel shotgun over the top of the hood, and said "run them pockets," at which point D.C. realized that he was being robbed.

D.C. responded by claiming that he did not have anything. The driver of the vehicle replied, "[H]urry up before you get blasted." D.C. and J.H. turned and ran away from the scene. The passenger got back into the car, and the two African-Americans used the vehicle to pursue D.C. and J.H. D.C. and J.H. successfully evaded the vehicle by fleeing on foot, and they both later returned to D.C.'s home and contacted the police.

D.C. was unable to identify the two perpetrators from a photographic lineup the police later showed to him.

### B. The First Degree Murder of Juan Garcia (Count 3)

At around 3:18 a.m. on September 11, 2016, C.G. heard what she thought was a car crash outside her residence on East

8

12th Street in Long Beach.  She later told the police that she heard a loud bang followed by footsteps and then a door closing.

At around 3:39 a.m., a police dispatcher informed Long Beach Police Officer Robert Cruz (Officer Cruz) of a shooting on West 12th Street.  Upon Officer Cruz's arrival at the scene, he found a man on the ground who appeared to be dead.  Shotgun wadding was discovered nearby, yet no weapon was found at the scene.  The wadding was manufactured by Remington for use in a 12-gauge shotgun.  A wallet found on the man revealed that his name was Juan Garcia.  An autopsy of Garcia's body later concluded that he died from a shotgun wound to the back of the head, and that 20 to 30 feet separated Garcia from the shooter.

At about 3:15 a.m. on September 11, 2016, Signal Hill Police Officer Brandon Moulton (Officer Moulton) saw a gray Mercedes-Benz run a red light on the Pacific Coast Highway.  The Pacific Coast Highway is located approximately six blocks away from the location where Officer Cruz found Garcia's body.  The Mercedes-Benz made its way into a parking lot where a man later identified as Deshawn Brittman got out of the vehicle and walked toward a nearby convenience store.  The Mercedes-Benz then sped out of the parking lot.

On October 7, 2016, Mauricio Hernandez arrived at the underground parking lot of his apartment complex in Long Beach and discovered a shotgun near a fence.  The police later took possession of the weapon, which was a black 12-gauge Mossberg shotgun that had a bloodstain on it.  A forensic analysis of DNA found on the shotgun revealed that the chance the DNA belonged to a person other than Hall was 1 in 980 octillion.  The shotgun also had another person's DNA on it, but there was not enough of

9

this genetic material to allow a forensic analyst to draw any conclusions from it.

### C. The Second Degree Robberies of D.G., H.G., and O.G. (Counts 4, 5, and 6)

At about 3:40 a.m. on September 11, 2016, three brothers—D.G., H.G., and O.G.—were drinking beer outside on East 14th Street in Long Beach. Several African-American men emerged from two vehicles and approached D.G., H.G., and O.G. Two of these men had firearms—i.e., a handgun and a shotgun or a rifle. The African-American men pointed the guns at the brothers and demanded their wallets. D.G., H.G., and O.G. handed over their personal property, including H.G.'s gold chain and the keys to O.G.'s Audi. The robbers then returned to their vehicles, one of which was a gray car, and drove away.

After the perpetrators exited the scene, O.G. stood guard over his Audi. O.G. eventually left this location, and when he later returned, he discovered that the Audi was missing.

### D. The Police Investigation

A video recording from a pawnshop depicted "a vehicle consistent with being" the Audi stolen from O.G. arriving at the establishment at about 11:20 a.m. on September 11, 2016. The recording also showed the car's five African-American occupants get out of the vehicle and enter the building. At about 11:35 a.m., a pawnbroker at the location purchased various items, including a gold chain, from an African-American customer who had a "rat tail" hairdo.

That afternoon, police observed a Mercedes-Benz park at a strip mall; the vehicle's three African-American occupants entered a telephone store. Later, police saw Hall (who at that

10

time had a pony tail) drive an Audi into that parking lot and go into the telephone store and then a nearby pizzeria. Several minutes later, Hall returned to the Audi and backed out of the parking lot. After police initiated their pursuit of the Audi, Hall crashed the vehicle, fled on foot, and was apprehended by the police.

Police searched the Audi and found a telephone that belonged to Jones, which contained a photograph of Hall that was taken on August 25, 2016. Another telephone that was found in the Audi belonged to Hall.

Cellular telephone records indicate that at 3:00 a.m. on September 11, 2016, Hall's telephone was in an area just north of the scene of the shooting. These records also show that between 12:04 p.m. and 1:05 p.m. that day, Hall's telephone was in the vicinity of the pawnshop. The records further indicate that Hall's and Jones's telephones were near Hall at the time he was arrested.

## 2. Hall's Defense

Hall's counsel suggested in her closing argument that although the People presented circumstantial evidence the homicide was committed with a shotgun, the People had not shown that Hall was the person who shot Juan Garcia. The attorney further argued the People had not established that Hall was "anywhere near the Mercedes-Benz" at issue on September 11, 2016. Hall's counsel also stated that D.C. failed to identify Hall as the perpetrator of the attempted robberies, and intimated that D.G., H.G., and O.G. could not accurately recall the circumstances of the robberies. For instance, Hall's counsel argued there were discrepancies in the brothers' accounts regarding, among other things, the number of perpetrators

11

involved and the brothers' descriptions of the perpetrators and the vehicles and weapons at issue.

## DISCUSSION

In Hall's opening brief, which was filed more than three months before AB 333's enactment, he challenges the trial court's decision to resume the trial after a six-month recess, the sufficiency of the evidence supporting the gang enhancements under the pre-AB 333 version of the gang enhancement statute, and the court's award of only 1,500 (as opposed to 1,501) presentence custody credits. (See also Stats. 2021, ch. 699 [AB 333 was filed with the Sec'y of State on Oct. 8, 2021, more than three months after Hall filed his opening brief].) Although our prior opinion resolved each of these issues, we since vacated the opinion in accordance with the Supreme Court's instructions.

Before addressing AB 333's amendments to the gang enhancement statute, we reach the merits of the three claims Hall had initially raised for the following reasons. First, Hall's claims of error remain unadjudicated because our prior opinion was vacated. Second, Hall clarifies in his supplemental brief he still believes "the judgment should be reversed" for "the reasons stated in [his] prior briefing," meaning that he has not withdrawn his initial claims. Third, Hall's invocation of AB 333 does not moot his challenge to the trial court's decision to resume the trial after a six-month suspension of the proceedings because he argues the court's resumption of the trial is an error that invalidates the *entirety* of the judgment. Fourth, it is unclear whether double jeopardy would preclude retrying Hall on the gang enhancements and the related firearm enhancements if he were to prevail on his initial insufficiency-of-the-evidence claim under the pre-AB 333 version of the statute. (See *People v. Seel*

12

(2004) 34 Cal.4th 535, 546–547 [suggesting that, to determine whether double jeopardy protections apply to a sentencing enhancement that is reversed for insufficient evidence, an appellate court must ascertain whether the enhancement " 'is the functional equivalent of an element of a greater offense' "]). Without deciding that issue, and in an abundance of caution, we address the sufficiency of the evidence as to the gang and related firearm enhancements under the older version of the statute. Lastly, Hall's reliance on AB 333 has no impact on whether he is entitled to an additional day of presentence custody credit.

## A. Hall Fails to Show the Trial Court Erred in Denying His Motion for a Mistrial and in Allowing the Trial to Resume after a Six-Month Suspension of the Proceedings

" 'We review a ruling on a mistrial motion for an abuse of discretion.  [Citations.]' " (*People v. Bell* (2019) 7 Cal.5th 70, 121 (*Bell*).)  "In general, 'a motion for mistrial should be granted only when " 'a party's chances of receiving a fair trial have been irreparably damaged.' " ' [Citation.]" (*Ibid.*)  " 'A trial court should declare a mistrial only " 'if the court is apprised of prejudice that it judges incurable by admonition or instruction.' " [Citation.]  "In making this assessment of incurable prejudice, a trial court has considerable discretion." ' [Citation.]" (*Ibid.*)

" 'Due process requires that the accused receive a trial by an impartial jury free from outside influences.' [Citation.]" (*People v. Santamaria* (1991) 229 Cal.App.3d 269, 281 (*Santamaria*).)  " '[T]he very character of certain procedures [makes] it impractical to establish the degrees of prejudice which [have] resulted therefrom.  [Citation.]  In these circumstances the defendant need not show that he was *actually* prejudiced during

his trial in order to establish a denial of due process of law; it is enough if he can show there was a reasonable *probability* of prejudice.  [Citations.]'  [Citation.]"  (*Id.* at p. 280.)

"An error is ' "structural," and thus subject to automatic reversal, only in a "very limited class of cases," ' such as the complete denial of counsel, a biased decision maker, racial discrimination in jury selection, denial of self-representation at trial, denial of a public trial, and a defective reasonable-doubt instruction.  [Citation.]  What unites this class of errors is 'a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." . . . Put another way, these errors deprive defendants of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." ' [Citation.]"  (*People v. Mil* (2012) 53 Cal.4th 400, 410 (*Mil*).)

Hall does not contend the emergence of the COVID-19 pandemic was an improper ground for suspending the trial. Rather, Hall argues the trial court abused its discretion in denying his motion for a mistrial "because [the court] should have recognized that a recess of six months deprived [Hall] of a trial that comported with fairness," and that, "even if it did not err in this regard, the lengthy [six-month] recess adversely impacted the fairness of the trial itself," thus "depriv[ing] [Hall] of his state and federal constitutional rights to a fair and impartial jury trial."  With regard to his constitutional claim, Hall argues the continuance " 'involve[d] such a probability that prejudice will result that it is deemed inherently lacking in due process.' "  Hall

14

further contends that the resumption of trial amounts to structural error that is "reversible per se."

Hall's claims of error arising out of the six-month continuance of his trial arise from four premises (several of which overlap): (1) "[N]o juror in this case could have adequately recalled the trial court's initial instructions such that [we] can presume that the jurors followed them"; (2) "the likelihood that each juror could recall the demeanor and comportment of" the People's witnesses who testified before the six-month continuance "strains credulity and places into question the reliability of the fact-finding process"; (3) "in the absence of questioning by the trial court, no reasonable basis existed for the trial court to assure itself that the jury's impartiality remained intact after such a long time period"; and (4) "a danger lurked that the jurors' exposure to only part of the prosecution's case [before the six-month recess] resulted in premature conclusions and a determination of guilt before both sides had rested," "especially since the trial court did not reread the [initial] instructions" upon the resumption of trial.

We acknowledge the better practice would have been for the trial court to reread its preliminary instructions to the jury prior to the six-month recess and immediately upon the continuation of the trial.[6]  Nonetheless, we conclude Hall has not established this omission amounts to reversible error.

_____

[6] Hall does not argue that during the six-month recess, the trial court should have summoned the jurors for the purposes of repeating the court's preliminary instructions to them or that the health concerns raised by the COVID-19 pandemic would have even allowed such a gathering.

15

That the trial court read the preliminary instructions a mere four calendar days before the suspension of trial suggests the jury had little difficulty recalling the instructions at the outset of the recess. Those preliminary instructions directed the jurors not to (inter alia): "read, listen to, or watch any reports or commentaries about this case during the trial"; "listen to anyone who tries to talk to [the jurors] about the case or about any of the people or subjects involved in it"; or "make up [their] mind[s] about the verdict or any issue until after [they have] discussed the case . . . during deliberations." The initial instructions also provided: "If you do receive such information or if anyone influences you or you witness someone trying to influence another juror, you must immediately tell [the] bailiff." Furthermore, the record shows that during this 11-day jury trial, the court ordered the jurors not to discuss the case with anyone on at least eight occasions after it had given the introductory instructions; on four of those occasions, the court also told the jurors not to decide the case until it was formally submitted to them; and two of the admonitions not to discuss the matter and prematurely decide the case were given before the trial was suspended on March 16, 2020. (See *People v. Gray* (2005) 37 Cal.4th 168, 230 (*Gray*) ["To give an abbreviated admonishment after first delivering a full one is permissible."].)

As important, Hall does not claim to have asked the trial court to repeat the preliminary instructions when the trial resumed, nor is it apparent from the record that he ever made such a request. Because Hall has not shown he requested that the court repeat the preliminary instructions or that he suffered any prejudice from the court's failure to repeat the instructions sua sponte, we cannot conclude this omission deprived him of a

16

fair and impartial jury trial. (Cf. *Gray*, *supra*, 37 Cal.4th at pp. 229–230 [" ' "[E]rror in failing to give [a] required admonition does not require reversal unless the defendant calls the trial court's attention to the omission at the time of the adjournment, or unless the defendant on appeal affirmatively points to prejudice resulting from the omission." ' [Citation.]"].)

We also reject Hall's complaint that the continuance deprived him of a fair and impartial jury trial because (a) the jury heard only witnesses from the People before the trial was suspended, and (b) the jury may have forgotten the witnesses' demeanor and comportment during their testimony.

At an April 1, 2020 hearing regarding the status of the case, the court observed that continuing the trial had resulted in "no prejudice" to Hall because "no identifications [had been] made, no direct witnesses to any of the charges ha[d] come and testified yet and no one ha[d] made any formal [identifications] in court yet . . . ." In the court's minute order for that hearing, the court further found that: "1. The jury only heard testimony regarding the crime scene as to count 3 [(i.e., the murder charge)] and the collection of evidence involving count 3. [¶] A. This includes crime scene photos. [¶] B. Photos of cars[. ¶] C. Collection of shot gun pellets, etc. [¶] 2. No victims for counts 1, 2, 4, 5 or 6 [(i.e., the remaining counts)] ha[d] testified. [¶] 3. No identifications of the defendants ha[d] occurred." Hall fails to dispute the trial court's characterization of the evidence presented up to that point, and thus admits it is accurate. (See *People v. Giordano* (2007) 42 Cal.4th 644, 666 ["On appeal, we presume that a judgment or order of the trial court is correct, ' "[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be

17

affirmatively shown." ' [Citation.]"].) It is also not apparent that the jurors' exposure to this evidence prior to the six-month continuance in any way prejudiced Hall's defense, given that Hall's closing argument indicates his theory was that he did not perpetrate these offenses, and not that these offenses did not in fact occur.

Insofar as Hall was concerned the six-month delay of the trial hindered the jurors' ability to recall the demeanor and conduct of the witnesses who testified before the recess, he could have mitigated any such prejudice by asking the trial court for permission to summarize the testimony given up to that point. (Cf. *Santamaria*, *supra*, 229 Cal.App.3d at p. 282 ["Had the adjournment occurred in midtrial, counsels' recapitulation of the evidence during argument might have nullified or minimized the effect of the delay on the jurors' recall."].) Here, the trial court did afford the parties the opportunity once again to provide opening statements upon the resumption of trial.

Instead of requesting leave to use the opening statement to remind the jury of any weaknesses in the evidence the People had presented, Hall's counsel objected to the trial court's offer to present new opening statements on the ground that counsel did not "think it[ was] proper to make an opening statement after [the prosecutor] already kn[ew] what [his] evidence [was] . . . ." In response to that objection, the court ruled the parties could provide only "a very brief reopening, just to remind [the jury] what the charges [we]re and the gist of what the trial [was about]." Hall's counsel thereafter decided to provide the following terse opening statement: "Just to remind the jurors, nothing counsel said is evidence. It's merely his hopes." Because Hall had a reasonable opportunity to remind the jury of the witnesses'

demeanor and comportment while testifying, any juror's failure to recall that information does not constitute *unfair* prejudice warranting reversal of the judgment. (See *People v. Houston* (2005) 130 Cal.App.4th 279, 320 ["[A]ppellant ' " 'is entitled to a *fair* trial . . . not a perfect one[,]' " ' [citation]," italics added].)

Next, Hall's concern that the delay in the proceedings may have prevented the jury from continuing to be open-minded is entirely speculative. Hall does not claim that upon resumption of the trial, he asked the trial court to assess the jurors' continued ability to be impartial, and it does not appear that he did so. (See *Gray*, *supra*, 37 Cal.4th at pp. 230–231 [noting that a defendant may move to reopen voir dire of the jury].) Nor does Hall claim to have submitted any juror affidavits to the trial court to demonstrate the jurors had been exposed to extrajudicial information during the trial's suspension. (See, e.g., *People v. Engstrom* (2011) 201 Cal.App.4th 174, 182–184 [noting that a defendant may prove juror misconduct with affidavits describing " 'statements, conduct, conditions, or events as are "open to sight, hearing, and the other senses and thus subject to corroboration" ' "].) Instead, Hall's argument seems to be that the six-month continuance alone gives rise to an unreasonable risk that the jurors could not remain fair and neutral. In the absence of any evidence that this delay had any tendency to compromise the objectivity of the jurors, we cannot presume that it infringed on Hall's rights to a fair and impartial jury trial. (Cf. *Gray*, at pp. 225–226, 228–230 [holding that "the mere possibility the jury may have acquired or been exposed to some extrajudicial information about the case [was] an insufficient basis on which to reverse [the] judgment" when there was a 338-day delay between the guilt and penalty phases of a capital trial and "the trial

19

court . . . carefully admonished the jurors not to discuss the case, to avoid improper influences, not to speculate about the reason for the delay, and to inform the court if any such improper contact occurred"].)

Lastly, although Hall paraphrases, and quotes extensively from, several judicial opinions in the "[a]pplicable [l]aw" part of his briefing, he makes no attempt to analogize any of those cases to the instant matter. (Boldface omitted.) Accordingly, his reliance on this case authority is unavailing. (See *Hodjat v. State Farm Mutual Automobile Ins. Co.* (2012) 211 Cal.App.4th 1, 10 ["[A]n appellant is required to not only cite to valid legal authority, but also explain how it applies in his case."].)

For these reasons, we conclude Hall has not shown the trial court abused its discretion in resuming the trial after suspending the proceedings for six months due to the COVID-19 pandemic (see *Bell*, *supra*, 7 Cal.5th at p. 121), or that there is " 'a reasonable *probability*' " the continuance abridged his constitutional right to a fair and impartial jury trial. (See *Santamaria*, *supra*, 229 Cal.App.3d at p. 280.) Because Hall has not shown the trial court erred, we do not reach his argument that the judgment is subject to automatic reversal. (See *Mil*, *supra*, 53 Cal.4th at pp. 409–410 [indicating that the structural error doctrine applies only if an appellate court has found error].)

## B.   We Reject Hall's Sufficiency-of-the-Evidence Challenge Under the Pre-AB 333 Version of the Gang Enhancement Statute

" 'In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial

20

evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 656–657 (*Ochoa*).)  In conducting this analysis, the reviewing court must "view[ ] all the evidence in the light most favorable to the prosecution, and draw[ ] all reasonable inferences in favor of the jury's findings." (See *People v. Perez* (2017) 18 Cal.App.5th 598, 607 (*Perez*).)

"[W]e *must* begin with the presumption that the evidence . . . *was* sufficient, and the defendant bears the burden of convincing us otherwise. . . . [¶] . . . [A]n appellate court is 'not required to search the record to ascertain whether it contains evidence that will sustain [the appellant's] contentions.' [Citation.] . . . [¶] . . . [T]he defendant must set forth in his opening brief *all* of the material evidence . . . in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict." (See *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573–1574 (*Sanghera*).)

This substantial evidence standard applies to sufficiency-of-the-evidence challenges to enhancements imposed pursuant to section 186.22, subdivision (b).  (See *Ochoa*, *supra*, 179 Cal.App.4th at pp. 656–657.)  Section 186.22, subdivision (b) authorized the trial court to enhance a defendant's prison sentence if "[t]he evidence . . . establish[es] both of the two prongs to the gang enhancement under section 186.22, subdivision (b)(1).  'First, the prosecution is required to prove that the underlying felonies were "committed for the benefit of, at the direction of, or in association with any criminal street gang."  [Citation.]  Second, there must be evidence that the crimes were committed "with the specific intent to promote, further, or assist in any criminal

21

conduct by gang members." ' [Citation.]" (See *Perez, supra,* 18 Cal.App.5th at pp. 606–607.)

Although Hall does not challenge the sufficiency of the evidence underlying his convictions, he does maintain in his opening brief that "[b]ecause insufficient evidence supports the allegations that [Hall's] criminal conduct was gang related [under the pre-AB 333 version of section 186.22], the gang enhancements found true by the jury must be stricken as well as the gang related firearm enhancements as to counts four through six." (Citing, inter alia, § 12022.53, subds. (b) & (e)(1) [provisions concerning the 10-year firearm enhancement].)

Specifically, he contends "the record contains no evidence that during this crime spree, [Hall] or anyone with him shouted out a gang name or flashed a gang sign," "any of the complaining witnesses knew that the perpetrators were gang members," "any of the offenses were committed as retaliation in response to prior gang activity," "[Hall] knew or at least thought that Juan Garcia . . . belonged to a rival gang," or "any gang profited monetarily or through enhancement of its reputation as a result of the criminal conduct charged in this case" (e.g., by leaving graffiti taking credit for these offenses).

Hall further asserts that "while [he] and Jones may have been gang members whose crimes were committed in their gang's territory, the record contains no facts that permitted the prosecution's gang expert to discern whether the two men were acting on their own during the commission of their offenses or whether the men came together as gang members for that purpose."[7] Additionally, Hall argues that "while robbery and

---

[7] Hall does not dispute the Attorney General's claim that Hall and Jones committed the robberies and attempted robberies

22

murder may constitute primary activities of [Hall's] gang, [citation], '[t]here was no evidence that only gang members committed [these offenses] or that a gang member could not commit [these offenses] for personal benefit, rather than for the benefit of the gang.' [Citation.]" For the reasons discussed below, we reject Hall's claim of error because, under the pre-AB 333 version of the statute, substantial evidence supported both prongs of the gang enhancement for all six counts.

---

together. (See *Reygoza v. Superior Court* (1991) 230 Cal.App.3d 514, 519 & fn. 4 (*Reygoza*) [criminal case in which the Court of Appeal assumed that an assertion made by respondent was correct because "defendant did not dispute respondent's claim in his reply"]; *Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89–90 (*Rudick*) [concluding that the appellants made an implicit concession by "failing to respond in their reply brief to the [respondent's] argument on th[at] point"].)

1. *The record contains substantial evidence that, under the pre-AB 333 version of section 186.22, Hall committed the robberies and attempted robberies for the benefit of, and in association with, a criminal street gang, with the specific intent to promote, further, and assist in criminal conduct by gang members*

Statements Hall made to jailhouse informants between September 11 and 12, 2016 indicate that Hall and Jones committed the robbery and attempted robbery offenses for the benefit of their gang, the Rollin 20s Crips.[8] The transcript of these conversations indicates that while he was in a cell with the informants, Hall referred to Jones by his gang moniker ("2 T's") and also called him "cuz," Hall told the informants "cuz" was "with the business" and "solid," and Hall answered in the affirmative when one of the informants asked him if Hall and "cuz" were "putting in work" when they perpetrated the robberies.[9]

Detective Sean Magee, the People's gang expert,[10] testified gang members use the phrase "putting in work" to refer to going

---

[8] At trial, Hall stipulated that he and Jones are members of the Rollin 20s Crips gang. On appeal, Hall does not retract this concession, nor does he contest the jury's implicit finding that the Rollin 20s Crips is a "criminal street gang" for the purposes of the pre-AB 333 version of section 186.22, subdivision (b).

[9] We rely upon this transcript for the content of Hall's conversations with the informants, just as the parties do in their briefing.

[10] At trial, the parties stipulated that Detective Magee qualified as an expert "regarding gangs in this case."

on a "mission" for their gang, and missions may include robberies. Detective Magee further testified that a robbery committed by gang members "benefits the gang because robberies make money and money allows the gang to buy weapons, to buy drugs, to defend themselves or protect their neighborhood." Detective Magee testified that if a person asks whether someone is "with the business," that person is trying to determine whether an individual has a "solid" reputation with the gang—i.e., whether he or she "is willing to put in work," is loyal to the gang, and "will not cooperate" with the police "at a later date." Under these circumstances, the jury could have reasonably interpreted Hall's statements to the informants as evidence that Hall and Jones committed the robberies and attempted robberies as part of a mission for the benefit of their gang. The detective also told the jury that gang members themselves benefit from committing a crime together because it establishes "comradery" and "trust" between them, enabling these members to carry out future missions together on behalf of the gang.

Similarly, certain text messages sent from Hall's telephone on the evening of September 10, 2016 also suggest Hall perpetrated the robberies and attempted robberies in his capacity as a gang member. At just before 6 p.m. that day, "Danile T." sent Hall's telephone a message that read: " 'You got a pistal [*sic*]' "; and the user of Hall's telephone sent the following message in response: " 'IK got the gage.' " Later on in the text message conversation, Danile T. stated, " 'Shit, IDK what's popen after tho' " and, " 'Might be a lic or somethings lol.' " In response, the user of Hall's telephone sent a message that read: " 'We gon make some shyt happen, T.' "

Detective Magee testified that a Rollin 20s gang member would use the term "IK" as a shorthand for "Insane Killer," a reference to a rival of the Rollin 20s called the Insane Crips. Detective Shea Robertson testified the term "gage" is a slang term for a shotgun. The People offered evidence showing that a shotgun was used to perpetrate the murder and robberies.[11] Furthermore, Detective Robertson explained that " 'lick' " is a slang term for a robbery, suggesting Hall expressed his intent to commit robberies with the "gage" in his text message conversation with Danile T. Hence, these text message conversations from September 10, 2016 constitute circumstantial evidence that Hall used a shotgun the following day in connection with gang business (i.e., as an "Insane Killer" committing "lics" or robberies), and not simply for his own benefit. (See *Perez, supra,* 18 Cal.App.5th at p. 607 ["Rarely is the perpetrator's intent proven by direct evidence; usually it must be inferred from the facts and circumstances surrounding the case."].) Furthermore, Detective Magee testified robbery is one of the primary criminal activities of the Rollin 20s Crips, which further suggests that Hall robbed and attempted to rob the victims in his capacity as a gang member.

That the jury could reasonably have found Hall and Jones perpetrated the robbery and attempted robbery counts together as members of the Rollin 20s Crips is relevant to both prongs of

---

[11] Although the parties acknowledge in their briefing the People offered evidence that one of the perpetrators used a single-barrel shotgun to commit the attempted robberies against D.C. and J.H., the jury apparently rejected that evidence because the jury did not find that a principal personally used a firearm to commit those two offenses.

the pre-AB 333 version of section 186.22, subdivision (b). The first prong of the gang enhancement is not satisfied if " 'several gang members . . . commit a crime together, yet [are] on a frolic and detour unrelated to the gang.' [Citation.]" (See *People v. Albillar* (2010) 51 Cal.4th 47, 62 (*Albillar*).) Conversely, where, as is the case here, the perpetrators' "common gang membership ensured that they could rely on each other's cooperation in committing . . . crimes and that they would benefit from committing them together" (e.g., by building comradery and trust), "they commit[ ] [such] crimes in association with the gang" for the purposes of the first prong. (See *Albillar*, at p. 62.) Likewise, because "substantial evidence establishes that [Hall] intended to and did commit the charged [robberies and attempted robberies] with [a] known member[ ] of [his] gang, the jury may [have] fairly infer[red] that [Hall] had the specific intent to promote, further, or assist criminal conduct by [that fellow] gang member[ ]."[12] (See *Albillar*, at p. 68.)

---

[12] As noted at the beginning of this part, the second prong of the pre-AB 333 version of section 186.22, subdivision (b) required that the defendant commit the felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members." The statutory text's use of the plural term "gang members" and not the singular phrase "a gang member" arguably suggests the defendant must intend to "promote, further, or assist" more than one gang member's criminal conduct. This interpretation, however, "overlooks section 7, which provides that when construing words and phrases throughout the Penal Code, 'the singular number includes the plural, and the plural the singular. . . .' [Citation.]" (See *People v. Watson* (2021) 64 Cal.App.5th 474, 485 (*Watson*), quoting § 7; *Watson*, at p. 485 [" 'The rule of construction enunciated in [Penal Code] section 7 is no mere rubric—it is the law.' [Citation.]"].) Further, such an

27

In addition, Detective Magee testified that the perpetration of a robbery on behalf of a gang supplies the gang with funds, thus allowing the gang to commit other crimes, to wit, "buy weapons, . . . buy drugs, [and] to defend themselves or protect their neighborhood." In light of the aforementioned evidence that Hall committed the robbery and attempted robbery offenses in his capacity as a gang member, this testimony from Detective Magee constitutes substantial evidence supporting the second prong of the gang enhancement as to those counts.

In sum, notwithstanding the fact that Hall and Jones did not advertise their gang membership to their robbery and attempted robbery victims, there was substantial evidence that, under the pre-AB 333 version of the gang enhancement statute, Hall committed these crimes for the benefit of, and in association with, the Rollin 20s Crips, and with the specific intent of promoting, furthering, and assisting criminal conduct by its members.

---

unduly technical construction would significantly undercut the gang enhancement statute's objective of "eradicat[ing] . . . criminal activity by street gangs . . . ." (See § 186.21 [announcing the enhancement's legislative purpose]; see also *Albillar*, *supra*, 51 Cal.4th at pp. 54–55 ["[W]hen construing statutes, our goal is ' " 'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' " ' [Citation.]"].)

2. *The record contains substantial evidence that, under the pre-AB 333 version of section 186.22, Hall murdered Juan Garcia for the benefit of a criminal street gang, with the specific intent to promote and further criminal conduct by gang members*

Substantial evidence supports the pre-AB 333 version of the gang enhancement to Hall's sentence for murder as well.

The aforesaid evidence that Hall's telephone sent a text message that reads "IK got the gage" and that a shotgun was the murder weapon (see Discussion, part B.1, *ante*), along with Detective Magee's testimony that murder is one of the primary activities of the Rollin 20s Crips, tend to show Hall committed the murder to "put in work" for his gang.

The record also contains substantial evidence that Hall killed a rival gang member in territory claimed by Hall's and the victim's respective gangs, which supports the jury's finding that the gang allegation on the murder count was true. (See *People v. Rios* (2013) 222 Cal.App.4th 542, 574 [noting that whether (a) the defendant perpetrated the offense in gang territory and (b) the victim was a rival gang member are relevant factors under section 186.22, subdivision (b)].) Detective Magee opined the decedent, Juan Garcia, was a member of a rival of the Rollin 20s Crips (i.e., the Eastside Longos) because Garcia had an "HA" tattoo indicative of membership in that gang, Garcia was caught writing graffiti associated with his gang in 2010, and he was named as a defendant on an Eastside Longos gang injunction. Detective Magee stated the Eastside Longos gang claims the same territory as the Rollin 20s Crips, and Hall does not contest—and thus impliedly agrees with—the Attorney General's assertion the detective's testimony demonstrates that all the

29

offenses at issue, including the murder, "were committed in territory claimed by the Rollin 20's Crips."**13**

Hall argues the People did not present "any evidence that [Hall] knew or at least thought that Juan Garcia . . . belonged to a rival gang." Yet, Hall fails to explain why Garcia's "HA" tattoo does not constitute substantial evidence that Hall was aware of Garcia's membership in the Eastside Longos, even though the Attorney General mentioned in the respondent's brief that Garcia had a tattoo "denoting his membership in" the gang and referenced Detective Magee's testimony about the tattoo. Because Hall has made no effort to "persuade us that [this] evidence cannot reasonably support the jury's verdict," he has failed to discharge his burden of "*affirmatively demonstrat[ing]* that the evidence is insufficient" to show Hall was aware that the decedent was a member of a rival gang. (See *Sanghera, supra,* 139 Cal.App.4th at pp. 1573–1574; see also *id.* at p. 1573 ["To meet that burden, it is not enough for the defendant to simply contend, 'without a statement *or analysis of the evidence,* . . . that the evidence is insufficient to support the judgment[ ] of conviction[,]' [citation]," italics added]; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1139 ["We must presume all intendments and presumptions in favor of the judgment . . . ."].)

Moreover, the People presented evidence suggesting Hall could have seen Garcia's "HA" tattoo. Specifically, an autopsy report reveals that the "HA" tattoo was on Garcia's left elbow. Photographs of the decedent at the crime scene indicate that when his body was discovered, he was wearing a short sleeve

---

**13** (See *Reygoza, supra,* 230 Cal.App.3d at p. 519 & fn. 4; *Rudick, supra,* 41 Cal.App.5th at pp. 89–90.)

shirt exposing his elbows. Based on this evidence, a reasonable factfinder could have concluded Hall was aware of Garcia's membership in the Eastside Longos.

Detective Magee also testified that gang members leave graffiti on, and conduct "illegal narcotics sales" in, territory claimed by their gang, and that gang members use violence to defend that territory from their enemies. Detective Magee further opined that if a member of the Rollin 20s Crips were to kill an Eastside Longos gang member, that offense would "benefit[ ] the gang because an enemy gang member [has been] eliminated."

Given this evidence, the jury could have concluded Hall used a shotgun to murder Juan Garcia in order to put in work for his gang and defend gang territory, and thus allow his fellow gang members to continue to conduct criminal activities (including illicit drug sales and vandalizing private property) on Rollin 20s Crips' turf. In sum, we conclude there was substantial evidence that, under the pre-AB 333 version of the gang enhancement statute, Hall murdered Juan Garcia for the benefit of the Rollin 20s Crips with the specific intent to promote and further criminal conduct by the gang's members in territory that they claim.

## C. We Award Hall One Additional Day of Presentence Custody Credit

A defendant convicted of a felony is entitled to credit for the number of days he or she was in pretrial custody. (See *People v. Raygoza* (2016) 2 Cal.App.5th 593, 598–599.) "Computational errors [in the calculation of presentence custody credit] result in an unauthorized sentence, and are subject to correction by the trial court or the appellate court when presented." (See *People v. Guillen* (1994) 25 Cal.App.4th 756, 764.) The parties concede that Hall should have been awarded 1,501—rather than 1,500—days of presentence custody credit. Accordingly, we modify the judgment to reflect that Hall is entitled 1,501 days of presentence custody credit. (*Artal v. Allen* (2003) 111 Cal.App.4th 273, 275, fn. 2 [" '[B]riefs and argument . . . are reliable indications of a party's position on the facts as well as the law, and a reviewing court may make use of statements therein as admissions against the party. [Citations.]' [Citations.]"].)

## D. Based on AB 333's Amendments to Section 186.22, We Vacate the Gang and Related Firearm Enhancement Findings, and Remand to the Trial Court for Retrial of Those Enhancements, or, Absent Such a Retrial, for Resentencing

AB 333, which went into effect on January 1, 2022, "amends section 186.22 to require proof of additional elements to establish a gang enhancement." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 343 (*Lopez*).) Among other things, the statute "altered the requirements for proving the 'pattern of criminal gang activity' necessary to establish the existence of a criminal street gang." (*Id.* at p. 345.) Prior to AB 333's

enactment, "a 'pattern of criminal gang activity' mean[t] 'the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [certain enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more [persons].' [Citation.]" (See *Lopez*, at p. 345.) "[AB] 333 redefine[d] 'pattern of criminal gang activity' to require that the last of the predicate offenses 'occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed,' and that the predicate offenses 'were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offenses is more than reputational.' [Citation.] In addition, the currently charged offense cannot be used as a predicate offense under the amendments. [Citation.]" (*Lopez*, at p. 345, quoting Stats. 2021, ch. 699, § 3.)

AB 333 also made several other changes to the definition of " 'criminal street gang' "; defined " '[t]o benefit, promote, further, or assist' "; and added a new provision to the Penal Code requiring the trial court, upon request, to bifurcate the guilt and gang enhancement allegation phases of the trial (i.e., newly-added § 1109). (See *Lopez, supra*, 73 Cal.App.5th at pp. 344–345; Stats. 2021, ch. 699, § 5 [adding § 1109].)

As an initial matter, we agree with the parties that Hall "is entitled to the benefit of AB 333's amendments to section 186.22

33

as his judgment is not yet final."[14]  (See *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1087 (*Delgado*) ["[W]e agree [AB] 333's amendments to section 186.22 that became effective January 1, 2022 apply retroactively . . . . to a defendant whose judgment is not yet final . . . ."]; *Lopez, supra*, 73 Cal.App.5th at pp. 343–344 ["When [AB] 333 goes into effect on January 1, 2022, [the defendant's] judgment will not yet be final. . . .  As [AB] 333 increases the threshold for . . . the imposition of the enhancement, we agree with [the defendant] and the People that [the defendant] is entitled to the benefit of this change in the law. '[A] defendant is entitled to the benefit of an amendment to an enhancement statute, adding a new element to the enhancement, where the statutory change becomes effective while the case was on appeal, and the Legislature did not preclude its effect to the pending case.'  [Citation.]"]; see also *People v. Sek* (2022) 74 Cal.App.5th 657, 664–667 & fn. 4 (*Sek*) [holding that AB 333's new definition of " 'for the benefit of . . . a criminal street gang' " applies retroactively to judgments that are not yet final].)

Furthermore, the parties do not dispute "no substantial evidence was presented that one of the [two] predicate offenses" offered to establish the "pattern of gang activity" required to satisfy the statutory definition of "criminal street gang" (i.e., the voluntary manslaughter committed by Miquan Jackson) had

---

14 The Attorney General clarifies that "[t]his concession does not extend to the provisions of newly-added section 1109," which is the provision calling for the bifurcation of guilt and gang enhancement allegations upon a defendant's request.  (See § 1109, subd. (a).)  This limitation has no impact on the instant appeal because Hall does not claim section 1109 applies retroactively to his case.

34

"benefitted the gang beyond enhancing its reputation."  It is further undisputed that, because of this defect, "insufficient evidence supports the gang allegation under the law as amended by AB 333."  Accordingly, we vacate the gang enhancement findings for counts 1, 2, 3, 4, 5, and 6.[15]  (Cf. *Lopez, supra,* 73 Cal.App.5th at pp. 343, 346 [vacating the gang enhancement findings because the jury did not make the findings required by AB 333's amendments to section 186.22].)

Hall argues "the gang related gun enhancements attached to [his] convictions" must be vacated as well.  In his supplemental brief, however, Hall does not identify specifically *which* firearm enhancements must be vacated.  Nonetheless, in his opening brief, Hall contends that "the gang related firearm enhancements as to counts four through six" "must be stricken" "[b]ecause insufficient evidence supports the allegations that [his] criminal conduct was gang related . . . ."

We agree and vacate the firearm enhancement findings relating to counts 4, 5, and 6.  The verdict forms indicate the firearm enhancements for these counts were based upon the jury's findings that "a principal personally used a firearm, within the meaning of Penal Code Section 12022.53(b) and (e)(1) . . . ."  Under these provisions, a firearm enhancement may be imposed on an individual who did not personally use a firearm, but only if,

---

[15]  Given the Attorney General's concession that substantial evidence does not support the gang enhancements under AB 333's amendments to section 186.22, we need not address Hall's arguments that the prosecution failed to offer evidence satisfying other elements of the newly-amended gang enhancement statute (e.g., whether "the predicate offenses constituted 'collective criminal activity' by its members").

inter alia, that individual was " 'convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members' as set forth in section 186.22, subdivision (b).  [Citation.]"  (See *Lopez*, *supra*, 73 Cal.App.5th at p. 347, quoting § 12022.53, subd. (e)(1)(A).)  Because it is undisputed that AB 333's amendments negated the jury's gang enhancement findings under section 186.22, subdivision (b), "the true findings on these [firearm] enhancements, too, [must] be vacated . . . ."  (See *Lopez*, at pp. 347–348.)

Conversely, with regard to the murder conviction (i.e., count 3), the jury found Hall "personally and intentionally discharged a firearm, a shotgun, which caused great bodily injury and death . . . within the meaning of Penal Code Section 12022.53(d) . . . ."  In accordance with that finding, the trial court imposed an enhancement of 25 years to life on that count.  (See § 12022.53, subd. (d) [authorizing "an additional and consecutive term of imprisonment . . . [of] 25 years to life"].)  Because this firearm enhancement is not premised on a violation of section 186.22, AB 333 does not affect the jury's true finding on this enhancement to the sentence for count 3.  (See *Lopez*, *supra*, 73 Cal.App.5th at pp. 347–348 [holding that, notwithstanding AB 333, a firearm enhancement imposed pursuant to a finding that the defendant " 'personally and intentionally discharge[d] a firearm . . . which caused great bodily injury or death' " under § 12022.53, subd. (d) "remain[ed] intact"].)

The Attorney General concedes, Hall does not dispute, and we agree, that we "should remand the matter and order that the

36

prosecution be afforded an opportunity to . . . meet its burden of proof pursuant to AB 333's new requirements." (See *Sek*, *supra*, 74 Cal.App.5th at p. 669 [" ' " 'Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, [a] remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence.' [Citation.]" [Citation.]' [Citations.]"].)  If the prosecution does not elect to retry Hall on the gang and related firearm enhancements, then the trial court shall resentence Hall accordingly.  (See *Delgado*, *supra*, 74 Cal.App.5th at pp. 1088–1091 [reversing the true findings on certain gang enhancements on account of AB 333's amendments, remanding the case "to provide the People an opportunity to retry the criminal street gang enhancement[s,]" and stating that "[i]f the People elect not to do so, [the defendant] is to be resentenced in a manner consistent with this opinion"].)

## DISPOSITION

We vacate the gang enhancement findings made under Penal Code section 186.22, subdivision (b) for counts 1, 2, 3, 4, 5, and 6. We also vacate the firearm enhancement findings made under Penal Code section 12022.53, subdivisions (b) and (e)(1) for counts 4, 5, and 6. The judgment is modified to reflect that Defendant Elijah Kareem Shabazz Hall (Hall) is entitled to 1,501 days of presentence custody credit toward his state prison sentence. As modified, the remainder of the judgment is affirmed.

We remand this matter to the trial court to afford the People an opportunity to retry the gang enhancements for counts 1, 2, 3, 4, 5, and 6 and the firearm enhancements for counts 4, 5, and 6. If the People elect not to retry these enhancements, then Hall shall be resentenced in a manner consistent with this opinion.

NOT TO BE PUBLISHED.


BENDIX, Acting P. J.


We concur:


CHANEY, J.                    CRANDALL, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.